IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL LESANE<br><br>                    Plaintiff,<br><br>    against<br><br>CITIBANK, NATIONAL ASSOCIATION<br><br>                    Defendants. | Civil Action No. 1:20-cv-10216<br><br>COMPLAINT AND<br>JURY DEMAND |

Plaintiff Samuel Lesane hereby alleges, upon personal knowledge as to himself and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Samuel Lesane, a sixty-year-old disabled African American, has been a loyal Citibank customer for almost two decades. In December 2019 and April 2020, Mr. Lesane promptly reported unauthorized transactions on his account totaling over $5000.00. With the exception of $202.50, Citibank found all the charges to be authorized, despite the fact that: (i) the transactions deviated from Mr. Lesane's usual pattern of use; (ii) Mr. Lesane had filed a police report of identity theft; and (iii) Defendant Citibank itself had flagged the transactions as suspect. Although Mr. Lesane had a legal right to see the documents on which Citibank based its decision, Citibank failed to respond to his repeated requests for information related to its investigation.

2.    After extended advocacy, in August 2020, Citibank finally credited back all of the unauthorized charges with the exception of $500. Because of Citibank's delay, Plaintiff had no access to funds he desperately needed during the COVID-19 crisis. As a result, he fell behind on his bills, was dogged by creditors, had to go to food pantries to make ends meet and

1

experienced emotional distress as a result. Mr. Lesane continues to experience financial hardship because of Citibank's failure to credit back the outstanding unauthorized charge of $500.

3.    Plaintiff brings the instant action against Defendant for its failure to comply with the Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq.*, its implementing rules and regulations; New York General Business Law 349; and state common law. Plaintiff seeks damages, along with injunctive relief, reasonable costs, and attorney's fees.

## JURISDICTION AND VENUE

3.    Venue in this district is proper under 28 U.S.C. § 1391(b)(l) and (c)(2) because Defendant Citibank does business in this district, in part through its branch located at 201 W. 125th St., New York, NY 10027.

4.    Venue in this district is also proper under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## PARTIES

5.    Plaintiff Samuel Lesane lives in New York County and is a consumer as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(6) because he is a natural person, had an account held by a financial institution, was issued an access device by that financial institution, and entered into an agreement with that financial institution for the provision of electronic fund transfer services.

6.    Defendant Citibank, National Association is a national banking association whose principal place of business is located in Sioux Falls, South Dakota.

7.    Defendant is a financial institution as defined by the Electronic Fund Transfer Act, 15 U.S.C. § 1693a(9), because it is a national bank that directly or indirectly holds accounts

belonging to consumers, issued Plaintiff an access device and entered into an agreement with him to provide electronic fund transfer services.

## STATUTORY AND REGULATORY FRAMEWORK

*The Electronic Fund Transfer Act of 1978*

9.     The primary purpose of the federal Electronic Fund Transfer Act of 1978 (EFTA), 15 U.S.C. § 1693 *et seq.*, is "the provision of individual consumer rights" by establishing the rights and responsibilities of participants in electronic fund transfer systems. 15 U.S.C. § 1693(b).

10.     Regulation E ("Reg. E") is the set of federal regulations created to implement the EFTA. 12 C.F.R. § 1005 *et seq.*

11.     Under the EFTA, an "unauthorized electronic fund transfer" is "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." 15 U.S.C. § 1693a(12).

12.     The EFTA applies to "any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." Reg. E, 12 CFR § 1005.3 (a)(l).

13.     The EFTA contains an error resolution procedure which must be followed when a consumer disputes a charge. Under the procedure, when a consumer timely notifies the financial institution of an error, the financial institution must conduct an investigation; determine whether an error has occurred; and report or mail the results of the investigation and the financial institution's determination to the customer within ten business days. 15 U.S.C. § 1693f(a)(3) *et seq.*

14.     The financial institution's time to complete its investigation is extended to forty-five days if it provisionally credits the funds within the ten-day period, advises the customer of the credit within two business days of the credit, gives the consumer full use of the funds during the investigation, corrects the error within one business day of determining an error occurred, and informs the consumer of the results of the investigation within three business days of its conclusion. 15 U.S.C. § 1693f(c); 12 CFR § 1005.11.

15.     For transactions which involve a point of service purchase, the same time frame applies, except that the investigation time period of ten days when no provisional credit is made to the account for disputed charges is extended to twenty business days, and the forty-five day period is extended to ninety days. 12 CFR § 1005.11(c)(3).

16.     If the financial institution, having found that the transaction was unauthorized, has failed to provisionally credit back the disputed transaction, it must credit back the amount of the transaction plus any related fees or interest to the account within one business day of its decision. 15 U.S.C. § 1693f(b).

17.     The EFTA limits the consumer's liability for unauthorized charges resulting from the loss or theft of an access device to $50 if the disputes are reported within two business days after the consumer learns the access device, such as an ATM or Debit card, has been lost or stolen. 15 U.S.C. § 1693g(a).

18.     The financial institution has the burden of proving a disputed transaction is authorized and that the consumer is liable for the disputed charges. The financial institution may not impose liability on the consumer unless the financial institution has provided the consumer with the disclosures required by the EFTA. 15 U.S.C. § 1693g(b).

19.    The disclosures relevant to the instant action consist of a summary of the consumer's rights under Regulation E, including the extent of the consumer's liability for unauthorized electronic transfers and an explanation of the error resolution process. The disclosures must have been made at the same time as the agreement for the electronic transfer service or before the consumer's first electronic transfer. 12 CFR 1005.7(a)

20.    A consumer's negligence does not create liability for the unauthorized transactions:

> [C]onsumer behavior that may constitute negligence under state law, such as writing the PIN on a debit card or a piece of paper kept with the card, does not affect the consumer's liability for unauthorized transfers.

Official Interpretations of Reg. E, 12 CFR Pt. 1005, supp. 1, § 1005.

21.    According to the EFTA's legislative history, the limitation on the consumer's liability for unauthorized transfers is "perhaps the most important protection contained in the entire Act."

22.    A consumer may recover actual damages, plus an additional sum in the $100-$1,000 range, the costs of the action, and reasonable attorney's fees, for a bank's violations of the EFTA. 15 U.S.C. § 1693m(a)(1)-(3).

23.    A court may award treble damages if it finds that a financial institution "did not make a good faith investigation of the alleged error," "did not have a reasonable basis for believing that the consumer's account was not in error," or "knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation." 15 U.S.C. § 1693f(e).

***Office of the Comptroller of the Currency Handbook***

24.     In August 2014, the Office of the Comptroller of the Currency (OCC) issued a "Comptroller's Handbook" ("OCC Handbook") on consumer compliance and the EFTA.

25.     The OCC Handbook states, in accordance with the EFTA and Regulation E: "The extent of the consumer's liability is determined solely by the consumer's promptness in notifying the financial institution.... *other factors may not be used as a basis to hold consumers liable*." (Emphasis added.) OCC Handbook, p. 20.

26.     For unauthorized transfers which did not involve the loss or theft of an access device, such as person to person money transfers made using an app, the OCC Handbook specifies that the consumer will have no liability for unauthorized transfers reported "[w]ithin sixty calendar days after transmittal of the periodic statement on which the unauthorized transfer first appears." *Ibid* p. 22.

27.     For transactions involving an access device, such as a bank card, the OCC explained that "institutions cannot assume that they have satisfied their duty to investigate simply by concluding that the customer's debit card and PIN were used in the transaction at issue. Rather, institutions must take steps to investigate whether there are indications that unauthorized use occurred." *Ibid* pp. 24-25.

28.     The OCC Handbook makes recommendations of steps a financial institution can take to ensure compliance with the Regulation E error resolution procedures, including evaluating:

- documentation or written, signed statements provided by the customer;

- historical information on the customer's pattern of use (e.g., time, frequency, location, and types and amounts of transactions);

- the location of the transaction in relation to the customer's residence, place of business, or normal shopping locations;

- problems reported by other customers regarding the access device or ATM;

- signature information on POS [point-of-sale] transactions;

- police reports, if available; and

- film from security cameras, if available.

*Citibank's Accountholder Agreement*

29.     Upon information and belief, the deposit account agreement that applied to Mr. Lesane's Citibank checking account contains the terms set forth in the EFTA and Reg. E that if the consumer reports unauthorized charges made with a bank card within two business days after learning of the loss or theft of the card, the consumer's liability cannot exceed more than $50 if the card was used without the consumer's permission.

## FACTUAL ALLEGATIONS

30.     Plaintiff Samuel Lesane ("Mr. Lesane") is a disabled low income sixty-year-old African American who lives in Harlem, a neighborhood in upper Manhattan.

31.     Mr. Lesane is a natural person as defined by the EFTA.

***Plaintiff's Citibank Account History***

32.     Mr. Lesane has had a personal account with Defendant Citibank, National Association ("Citibank") for approximately twenty years.

33.     Citibank provided Mr. Lesane with a debit card which gave him access to his account and permitted him to make transfers electronically to and from his account through the use of ATMs and to make point of service purchases, the cost of which would be debited from his account.

34.     Upon information and belief, Citibank's account holder agreement limits an accountholder's responsibility for unauthorized charges to a maximum of $50 if reported within sixty days of the charge's first appearance on a statement or if the customer reports the theft or loss of a bank card within two business days after discovery of the loss or theft.

***The Pattern of Use on the Account***

35.     Mr. Lesane's only income is Social Security Disability, which is deposited into his account once a month.

36.     Mr. Lesane pays his larger monthly bills, including his rent, by scheduling direct payment from his bank to the creditor.

37.     Mr. Lesane never uses money transfer apps to pay merchants or creditors.

38.     Mr. Lesane chiefly uses ATM's when he needs money for running errands and generally only withdraws amounts of $200 or less.

39.     Since March 2020, because of the COVID-19 pandemic, Mr. Lesane only leaves his home for essential business, so he runs errands much less often than previously.

40.     He rarely left his home in April 2020.

41.     Mr. Lesane typically makes withdrawals using his ATM card at Citibank branches to avoid ATM fees.

42.     Mr. Lesane never makes ATM withdrawals in large amounts, either in single transactions, or in repeated transactions during a short interval of time.

43.     Upon information and belief, Mr. Lesane has never made any ATM withdrawals or debit card purchases in the early morning hours prior to 5:30AM.

44.     Mr. Lesane is an older man with a vision problem which is worse at night, so he cannot use ATM's after dark.

45.     He also avoids going out late at night or in the early morning hours, a time when the streets in his Harlem neighborhood are usually empty, because he feels unsafe, so he generally conducts his banking during business hours.

46.     When Mr. Lesane makes withdrawals over $300, he almost always makes them in person at his bank.

47.     Mr. Lesane pays his large expenses, including his rent and utilities, by direct bill pay from his account.

48.     Mr. Lesane occasionally uses an app, called "Cash App," to transfer money to individuals, but he never uses it for large sums of money or to pay bills.

49.     Upon information and belief, Mr. Lesane's account history over the past twenty years demonstrates that it is out of character for him to make multiple large withdrawals from ATM machines in a single day, to repeatedly overdraw his account, or to use Cash App to transfer large sums of money.

***The December 2019 Fraudulent Transaction***

50.     On or about December 5, 2019, Mr. Lesane received an e-mail alert from Citibank informing him of a $500 electronic transfer made from his account which Citibank had identified as potentially fraudulent.

51.     Mr. Lesane called Citibank as soon as he read the e-mail and informed them that he had not made or authorized the transaction and did not know the person to whom the transfer was made.

52.     At that time, Mr. Lesane had Cash App installed on his smartphone and laptop, which was linked to his bank account and allowed him to make electronic payments from his account..

53.    Mr. Lesane had not set up a PIN number or password on his smartphone or laptop, so anyone who may have taken his phone or laptop would have access to the app.

54.    Mr. Lesane informed the Citibank representative that a houseguest staying with him at the time might have logged onto Mr. Lesane's account by using his phone or laptop without his knowledge or permission.

55.    The Citibank representative immediately deactivated Mr. Lesane's bank card. Mr. Lesane filed a police report to report the identity theft and named his house guest as the suspected perpetrator.

56.    Subsequently, Mr. Lesane put a password on his laptop and a PIN on his phone.

57.    When Mr. Lesane got a new bank card, he used a different PIN than the one on his last card.

58.    Mr. Lesane saved his bank card PIN number in a note file on both his phone and his laptop.

***Citibank's Investigation of the December 2019 disputed charge***

59.    On or about December 11, 2019, Citibank opened an investigation into Mr. Lesane's dispute of the $500 cash transfer made from his account on December 5, 2019.

60.    Citibank credited back the $500 charge pending the outcome of the investigation.

61.    On January 29, 2020, Citibank found the transaction authorized stating that "We have conducted our investigation using the information that you provided about the dispute. With the information we had, it wasn't enough to support your claim and resolve the dispute in your favor."

62.    Based on the language of the letter, Citibank did not consider the usual pattern of transactions on the account as a factor in its decision.

10

63.     The letter informed Mr. Lesane that Citibank would debit the provisionally credited $500 from his account in February 2020.

64.     Citibank attached a copy of a merchant "dispute response" to its letter.

65.     The dispute response included a transaction summary which contained an e-mail address, a phone number, and an IPO address for Mr. Lesane, as well as a name and phone number for the recipient.

66.     The summary indicated that the transaction occurred at 1:45 on December 5, 2019.

67.     Upon information and belief, the transaction occurred at 1:45AM.

68.     A screenshot of the transaction was also attached, which showed that the $500.00 had been sent to "Tommy," listed the recipient's e-mail address, and contained a notation to the effect that the payment was for rent.

69.     Mr. Lesane did not recognize the e-mail address of the transfer recipient and does not know anyone named "Tommy."

70.     A representative at Mr. Lesane's local Citibank branch told him that the "Tommy" account was associated with a woman, whose last name was Rodriguez, and that she lives in public housing administered by the New York City Housing Authority.

71.     Mr. Lesane does not know Ms. Rodriguez.

72.     Mr. Lesane pays his rent using direct pay, which allows his rent money to be automatically deducted and paid to his landlord from his account.

73.     Mr. Lesane has never used Cash App to pay his rent, the recipient was not his landlord, he did not know the recipient, and the amount paid was more than his monthly rent.

74.     The screenshot indicated that the payment was made using an app created by Square, Inc.

75.     Upon information and belief, Square, Inc. markets Cash App, which is installed on Mr. Lesane's phone.

76.     According to the Better Business Bureau, Square.com has a history of complaints against it, many of which relate to identity theft.

77.     According to Square.com, the majority of these complaints relate to Cash App, which has also been the target of identity theft scams.[1]

78.     Mr. Lesane has never used Cash App to pay creditors and when he has used it to send money to individuals, it was for small amounts, never for an amount as large as $500.00.

79.     Upon information and belief, these facts were all known to Citibank at the time it made its determination.

80.     In July 2020 and September 2020, Mr. Lesane's attorney wrote to Citibank to renew the dispute of the transaction and to request information from the investigation.

81.     Citibank never responded to her letters.

82.     Citibank failed to comply with the EFTA's error resolution process in its investigation of the December 2019 unauthorized charge.

83.     Upon information and belief, Citibank failed to comply with its own policies and procedures and with Regulation E when conducting its investigation.

---

[1] Popper, N. *When Your Last $166 Vanishes:* 'Fast Fraud' Surges on Payment Apps*"10/11/2020, New York Times,*
https://www.nytimes.com/2020/10/11/technology/fraud-payment-apps.html?auth=login-email&login=email;
https://www.bbb.org/us/ca/san-francisco/profile/credit-card-merchant-services/square-inc-1116-370609

***The April 2020 Fraudulent Charges***

84.     In the early morning hours of April 3, 2020, Mr. Lesane was having trouble sleeping and decided to check his phone.

85.     He noticed he had several e-mail alerts from Citibank, one of which informed him that his application for a PayPal credit card had been received.

86.     Mr. Lesane became alarmed because he had not applied for a PayPal credit card.

87.     He immediately phoned Citibank and told the representative he spoke to that he had not applied for the card.

88.     The representative asked Mr. Lesane if he was aware that someone had tried to withdraw $1000 from his account earlier that morning.

89.     Mr. Lesane answered that he was not aware and told the representative he had not made or authorized the withdrawal.

90.     The Citibank representative informed Mr. Lesane that the withdrawal had been declined so he had nothing to worry about, that the representative would deactivate his bank card, and that Mr. Lesane would have to go to a Citibank branch to get a new one.

91.     When Mr. Lesane went to his local Citibank branch to get a new bank card a few days later, he changed the PIN number and saved it in a note file on his phone and his laptop

92.     On or about April 10, 2020, when Mr. Lesane was checking his account balance, he saw that his account was overdrawn.

93.     Mr. Lesane contacted Citibank immediately to find out why his account had a negative balance and was transferred to the fraud department.

*Citibank's Investigation of the April 2020 disputed charges*

94.     Mr. Lesane spoke to a Citibank fraud investigator, first name "John," who informed him of several transactions on the account which Mr. Lesane had not made or authorized.

95.     Mr. Lesane never gave anyone authorization to use his debit card, his phone, or his laptop to make the disputed transactions on his account.

96.     Mr. Lesane received no benefit from the disputed transactions.

97.     According to a transaction history provided by Citibank, the unauthorized transactions on April 3, 2020 consisted of the following:

| Date | Time | Amount | ATM Fees | Type of transaction |
|---|---|---|---|---|
| 4/3/2020 | | $1530.00 | | Debit pin purchase |
| 4/3/2020 | | $2040.00 | | Debit pin purchase |
| 4/3/2020 | 5:07AM | $202.50 | | Cash withdrawal |
| 4/3/2020 | 4:59AM | $500.00 | | Cash withdrawal |
| 4/3/2020 | 5:00AM | $500.00 | | Cash withdrawal |
| 4/10/2020 | | | $17.50 | |

98.     Mr. Lesane told the investigator that he did not make or authorize any of the April 3, 2020 transactions.

99.     As a result of the fraudulent withdrawal of funds from his account, Mr. Lesane incurred overdraft fees which totaled $306.

100.    Mr. Lesane informed the investigator he suspected that an acquaintance staying with him at the time might have accessed his laptop or phone without his knowledge, obtained his PIN number from them and then used his bank card without his authorization.

101.    The acquaintance had asked Mr. Lesane questions to get information he might have used to guess his PIN or passwords or commit identity theft, such as asking him how old he was and when his birthday was.

102.    The investigator advised Mr. Lesane that he would need to file a police report and complete a Citibank fraud affidavit to dispute the charges.

103.    The investigator asked Mr. Lesane if he still had his bank card.

104.    Mr. Lesane said he did, because he still had his wallet.

105.    It was only after he hung up that Mr. Lesane looked inside his wallet and discovered the bank card in it was not his current bank card, but his prior bank card, which he had not yet discarded.

106.    Mr. Lesane called the investigator back immediately, but he did not pick up.

107.     Mr. Lesane left a phone message explaining his error and asking the investigator to call him back, but he never did.

108.    Mr. Lesane spent several days going back and forth between the police station and the bank.

109.    The police department did not want to accept Mr. Lesane's identity theft report without the Citibank fraud affidavit, but Citibank refused to give Mr. Lesane a copy of the

affidavit listing the disputes, instead they gave him a confirmation with not details stating he had filed a dispute.

110.    A female Citibank representative told Mr. Lesane she would not give him a copy of the affidavit to take to the police because she did not want him acting like a "vigilante" by filing a police report against the suspected perpetrator of the identity theft.

111.    Frustrated, Mr. Lesane called John, the investigator, from the Citibank branch.

112.    John told him the investigation had been closed because it had been a week since he reported the dispute and Mr. Lesane had not yet provided a police report.

113.    Mr. Lesane had not received any notification in writing from Citibank that his dispute had been denied and was shocked to hear the investigation had been closed a week or less after he reported the fraud.

114.    Mr. Lesane told John it was the middle of a pandemic and the trouble he had getting a police report because Citibank would not give him a copy of the fraud affidavit.

115.    John told Mr. Lesane he would have to file a new dispute to get the case reopened.

116.    After he spoke to John, Mr. Lesane finally succeeded in getting a police report and then called Citibank to file a second dispute.

117.    On or about April 23, 2020, a week or two after the investigator told Mr. Lesane that the investigation had been closed, Mr. Lesane received a letter from Citibank telling him it had determined that the charges he disputed, including the two withdrawals totaling $1000 which Citibank had declined, were authorized because they were made using his bank card and his PIN and because the banking activity was consistent with his usual pattern.

118.    Mr. Lesane immediately wrote to Citibank to contest the findings and informed Citibank that: he had been mistaken when he reported the card was in his possession; he had told the investigator of his error; he had filed a police report; and he still disputed the charges.

119.    Mr. Lesane also wrote that Citibank's failure to credit back the disputed charges was causing him financial hardship.

120.    In May 2020, Citibank acknowledged Mr. Lesane's dispute and confirmed they were opening a new investigation.

121.    On or about May 11, 2020, Citibank informed Mr. Lesane that it was issuing a provisional credit in the amount of $202.50 for one of the disputed charges to his account.

122.    Citibank did not issue a provisional credit for the other disputed charges of $2,040 and $1,530.

123.    In May 2020, Citibank informed Mr. Lesane by letter that it had found the disputed transaction of $202.50 to be unauthorized and that the provisional credit in that amount would become permanent.

124.    In a letter dated May 20, 2020, Citibank informed Mr. Lesane that it found the transactions in the amount of $2,040 and $1,530 to be authorized because they "were made from your account with your Citibank Banking Card…your Citibank Banking Card and Personal Identification Number were required to perform these withdrawals and the activity appears to be consistent with your normal banking activities" and "[y]ou informed us that your Citibank Banking Card has not been out of your possession."

125.    Citibank found these charges authorized after Mr. Lesane had informed Citibank verbally and in writing that his bank card had been stolen and that he had filed a police report.

126.    The disputed charges were not consistent with Mr. Lesane's banking patterns.

127.    Upon information and belief, Citibank did not complete its investigation within ten business days.

*Mr. Lesane's dispute of the fraudulent charges in June 2020-September 2020*

128.    In June 2020, Mr. Lesane retained an attorney to assist him in disputing the fraudulent transactions.

129.    Mr. Lesane's attorney contacted Citibank in July 2020 to ask Citibank to provide information related to its investigation of the disputed April 2020 transactions.

130.    Citibank never responded to Mr. Lesane's attorney's letter.

131.    In June and July 2020, Citibank repeatedly called Mr. Lesane to demand that he pay the overdraft fees he incurred as a result of the identity theft and Citibank's failure to provisionally credit back the $1,530 and $2,040 transactions Mr. Lesane disputed.

132.    In or about July 2020, Mr. Lesane informed a Citibank representative, first name "Tony," that he could not pay the fees because he did not have the money to do so.

133.    Tony checked the account records and informed Mr. Lesane that he saw a letter stating that in June 2020, Citibank had found the April 2020 charges of $1,530 and $2,040 to be unauthorized and credited the charges back to his account.

134.    Mr. Lesane told Tony that he had neither been informed the dispute had been resolved in his favor and that the money had not been credited back to his account.

135.    Mr. Lesane spoke to multiple representatives, including a supervisor, in an attempt to straighten the matter out, as one representative would tell him that the June 2020 letter appeared in the account records, and the next would say there was no such letter.

136.    A week or two later, Mr. Lesane received a letter from Citibank dated August 17, 2020 informing him that Citibank found the April 3, 2020 transactions in the amounts of $1,530

and $2,040 to be unauthorized and that the amount of the transactions together with any applicable interest or fee adjustments had been credited back to his account.

137.    Upon information and belief, Citibank did not complete its investigation of the $1,530 and $2,040 disputed charges within ten business days.

138.    Citibank did not give Mr. Lesane a provisional credit for the disputed charges.

139.    Upon information and belief, Citibank did not inform Mr. Lesane of the result of the investigation within three business days.

140.    Citibank credited back the disputed charges, but did not credit back the applicable fee adjustments within one business day of the  August 17, 2020 letter, and upon information and belief, did not credit back the applicable interest.

141.    Mr. Lesane continued to call Citibank about the overdraft fees resulting from the unauthorized charges and Citibank's delay in crediting them back to the account.

142.    On August 31, 2020, Citibank informed Mr. Lesane it was crediting back the overdraft fees to his account.

143.    Citibank failed to comply with the EFTA's error resolution process in its investigations of the April 2020 unauthorized charges.

144.    Upon information and belief, Citibank failed to comply with its own policies and procedures and with Regulation E when conducting its investigation.

***The Consequences of Citibank's Conduct on Mr. Lesane***

145.    Upon information and belief, Defendant routinely finds disputed charges made by consumers to be authorized when the facts do not support that conclusion, thereby improperly shifting the burden of establishing that they were unauthorized to consumers.

146.    Upon information and belief, Citibank has a history of discrimination in its provision of services to people of color.[1]

147.    Citibank's failure to comply with the EFTA's error resolution process caused Mr. Lesane to experience great hardship.

148.    Mr. Lesane was frustrated that Citibank did not believe him when he said that the transactions were unauthorized when he had been a loyal customer for nineteen years and the transactions were out of character for the account's pattern.

149.    Mr. Lesane suspected that Citibank did not believe what he told them because he is African American and lives in a poor area of New York City, and felt discouraged, hurt, and saddened by Citibank's conduct.

150.    Mr. Lesane's account was depleted of funds overnight as a result of the unauthorized transactions.

151.    Direct payments to creditors that Mr. Lesane had scheduled prior to the identity theft were declined or incurred overdrafts because Citibank denied Mr. Lesane's dispute without any basis and/or failed to provisionally credit back the disputed charges to the account in a timely manner.

152.    Mr. Lesane had overdrawn the account a few times in his twenty years with Citibank, but never so many times or so close together.

153.    Mr. Lesane was ashamed and embarrassed by the overdrafts and declined bill payments.

154.    When Mr. Lesane could not pay his bills, his creditors began to dog him, causing Mr. Lesane anxiety and embarrassment.

---

[1]https://www.housingwire.com/articles/48467-citibank-to-pay-25-million-for-violating-the-fair-housing-act/

155.    Creditors, including Citibank, bombarded him with phone calls and letters.

156.    Citibank kept insisting Mr. Lesane pay the overdraft fees which resulted from the unauthorized charges.

157.    Mr. Lesane had entered into a repayment agreement with a creditor who agreed to waive part of the debt if Mr. Lesane made his monthly payments on time.

158.    Because Citibank did not give Mr. Lesane access to his funds during their investigation, he was unable to do so.

159.    As a result, Mr. Lesane lost the favorable terms of the agreement and now owes an additional $2,100 to the creditor.

160.    Mr. Lesane also incurred late fees and interest on debts, including credit card balances and rent, because Citibank did not give him access to his funds.

161.    Mr. Lesane likes to take care of himself, so he started avoiding people because he didn't want them to know what he was going through.

162.    Mr. Lesane became withdrawn and reclusive, lost his appetite, and barely slept.

163.    Because he had no access to his money, Mr. Lesane couldn't afford to eat the way as he was used to.

164.    He had to make do with what he had and ended up living on hot dogs and Vienna sausages.

165.    Eventually, he had to swallow his pride and go to food banks for the first time in his life, sometimes having to stand on lines for hours to get the food he needed.

166.    He felt guilty for taking resources away from other people when he should have had the means to pay for his own groceries.

167.    He was frightened because he had to leave his home and wait on lines with other people during a pandemic, potentially putting himself at risk of becoming infected with COVID-19.

168.    He felt like there was no sun in the midst of all the clouds.

## FIRST CLAIM FOR RELIEF
## (Electronic Fund Transfer Act, 15 U.S.C. 1693 et seq.)

169.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

170.    This claim arises under the Electronic Fund Transfer Act (EFTA) and Regulation E because it relates to fraudulent and unauthorized electronic fund transfers.

171.    Defendant's actions violate 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§ 1005.6 and 1005.11.

172.    As a result of Defendant's violations of the EFTA and Regulation E, Defendant is liable to Plaintiff for statutory and actual damages, the costs of the action, and reasonable attorney's fees. 15 U.S.C. § 1693m.

173.    Because Defendant lacked a reasonable basis for denying Plaintiffs fraud claim, Plaintiff is also entitled to recover treble damages under 15 U.S.C. §1693f(e).

174.    Defendant's violations include, but are not limited to the following:

    a.    failing to limit Plaintiff's liability for the fraudulent and unauthorized electronic fund transfers in accordance with the EFTA and Regulation E;

    b.    failing to conduct a good-faith investigation of Plaintiff's claims of error or fraud;

    c.    failing to conduct the investigation and arrive at a determination within the time frame provided by the EFTA and Regulation E;

22

d.  failing to provisionally credit Plaintiff's account within ten business days and give Plaintiff full access to his funds during the investigation;

e.  failing to provide Plaintiff with Defendant's findings within three business days of the conclusion of its investigation;

f.  failing to provide Plaintiff with copies of documentation that Defendant relied on to reach its determination that there was no error or fraud, after Plaintiff requested the same; and

g.  failing to credit back the amount of the transaction and any related fees or interest to the account within one business day of finding the transaction was unauthorized.

## SECOND CLAIM FOR RELIEF
### (General Business Law §349)

175.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

176.    New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. Law §349.

177.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

178.    Defendant violated §349 of the New York Business Law by using deceptive acts and practices in the conduct of its business. Defendant's violations include, but are not limited to:

a.  making false representations that Defendant had performed a good-faith investigation of his fraud claim, when in fact Defendant did not do so;

b.  stating that the transactions in question were in fact authorized and not fraudulent, when Defendant's own records indicate numerous and obvious signs of fraudulent activity and Defendant itself identified some or all of the transactions as suspect;

c.  making deceptive statements to Plaintiff regarding the status of the investigation and whether money had been credited back to the account; and

d.  making deceptive statements to Plaintiff regarding the burden of proof of establishing the disputed charges were unauthorized.

179.    Defendant's conduct has a broad impact on consumers at large and is directed toward consumers at large and because it violates the public policies codified in the EFTA..

180.    Upon information and belief, Defendant has a pattern and practice of representing to consumers that Defendant has conducted a good-faith investigation of their fraud claims, when in fact Defendant has not, and of refusing to limit consumers' liability for fraud.

181.    Defendant's deceptive consumer-oriented acts and practices are misleading to a reasonable consumer in a material way.

182.    Defendant's deceptive consumer-oriented acts cause injury and harm to the public interest.

183.    As a result of Defendant's violations of 349 of the New York General Business Law, Plaintiff has sustained actual damages in an amount to be proven at trial and is also entitled to punitive damages, injunctive relief, costs and attorney's fees.

**THIRD CLAIM FOR RELIEF**
**(Unjust Enrichment)**

184.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

185.    As result of Defendant's failure to credit back the fraudulent and unauthorized transactions to Plaintiff's account, Defendant has been unjustly enriched.

186.    Defendant should be compelled to return all proceeds it received as a result of the unlawful acts described in this Complaint.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

187.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

188.    Upon information and belief, Defendant's deposit account agreement provided that consumers will not be held liable for unauthorized electronic fund transfers.

189.    Upon information and belief, Defendant breached this contract by holding Plaintiff liable for fraudulent transfers and withdrawals on his account made by an identity thief.

190.    As a result of Defendant's unlawful actions, Plaintiff suffered damages for emotional distress in an amount to be determined at trial, at least $2,600 in financial losses, plus such other damages as may be determined by the Court.

## FIFTH CLAIM OF RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing)

191.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as through fully set forth herein.

192.    Section 1-203 of New York State's Uniform Commercial Code imposes an obligation of good faith in the performance of any contract.

193.    Section 4-103 of New York State's Uniform Commercial Code states that no bank may disclaim responsibility for its own lack of good faith or failure to exercise ordinary care in the performance of its obligations.

194.    Further, under New York law, a covenant of good faith and fair dealing in the course of performance is implied in every contract.

195.    Defendant breached this duty and acted in bad faith by holding Plaintiff liable for fraudulent and unauthorized withdrawals and deposits from and to his account.

196.    Defendant further breached this duty by making an adverse report involving the fraudulent transactions to a credit reporting agency.

197.    Upon information and belief, Defendant made the report in retaliation for Plaintiff making good faith complaints to government agencies, including the CFPB and the OCC, for Defendant's failure to comply with the EFTA.

198.    As a result of Defendant's breach of the duty of good faith and fair dealing, Plaintiff is entitled to damages in an amount to be determined at trial.

**JURY DEMAND**

199.    Plaintiff demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter judgment for Plaintiff on all causes of action;

2.    Enter an injunction requiring Defendant to comply with the Electronic Fund Transfer Act and Regulation E, and to train its employees accordingly;

3.    Award actual, statutory, consequential, and punitive damages to Plaintiff;

4.    Award reasonable attorney's fees and costs to Plaintiff; and,

5.  Award such other and further relief as may be just, equitable, and proper.

Dated: December 4, 2020

Respectfully Submitted,

_____/s/_____

MARY P. McClJNE, of Counsel (MM3298)
MANHATTAN LEGAL SERVICES
*Attorneys for Plaintiff*
1 W. 125th St., 2nd Fl.
New York, NY 10027
(646) 442-3143 (phone)
(646) 859-8803
mmccune@lsnyc.org